NATIONAL LIFE & ACCIDENT INS. CO. v. LEWIS.

Middle Section. July 20, 1935.

Petition for Certiorari denied by Supreme Court, January 25, 1936.

Tyne, Peebles, Henry & Tyne, of Nashville, for plaintiff in error.
Alfred T. Adams and Chas. C. Trabue, Jr., both of Nashville, for defendant in error.

FAW, P. J. This is an appeal in error from a judgment of the Third circuit court of Davidson county for $150, with interest ($2.62), in favor of Fannie Lewis, the beneficiary named in a policy of industrial insurance issued July 10, 1933, by the National Life & Accident Insurance Company, defendant below, on the life of Monroe Rollins, who died on November 17, 1933.

It is stated at some places in the record that Monroe Rollins died on November 7, 1933, and in others that he died on November 17, 1933; but we are impressed that November 17th was the correct date of his death. It does not appear that there was any contro-

versy below with respect to the date of his death, and it is not material to the issues in the case whether he died on November 7th or November 17th.

The action below was begun before a justice of the peace of Davidson county on December 14, 1933, and the Insurance Company appealed from an adverse judgment of the justice of the peace to the circuit court of Davidson county, where the case was transferred to the Third circuit court and there tried to a jury with the result before stated.

At the close of all the evidence the trial court overruled a motion on behalf of the defendant Insurance Company for a directed verdict in its favor; and, after verdict, a motion for a new trial on behalf of the defendant was overruled (which motion embraced all the matters contained in the assignments of error in this court).

We will refer to the parties as plaintiff and defendant, respectively, according to their attitude on the record below.

There are six assignments of error. The first assignment is that there was no material evidence to support the verdict of the jury and the judgment of the court thereon.

The second assignment is that the evidence preponderated against the verdict of the jury. This assignment (the second) does not present a question which this court can consider.

The third assignment is that the court erred in failing and refusing to sustain defendant's motion for a directed verdict in its favor.

Through its fourth, fifth, and sixth assignments of error the defendant complains of the action of the trial court in failing and refusing to give in charge to the jury certain special requests for instructions tendered by the defendant.

The first and third assignments of error may be considered together, as they require an appraisal of the evidence from the same viewpoint. If the evidence was not sufficient to require the submission of the case to the jury, it necessarily follows that there was no material evidence to support the verdict of the jury.

On the trial below, it appeared, without dispute, that the policy was issued, that the premiums were paid, and that Monroe Rollins died before the institution of this suit.

The defenses urged by the Insurance Company were (1) that the policy never became operative or effective because said Monroe Rollins was not in sound health at the date of the policy; and (2) that the policy was avoided because of certain false statements and representations made by said Monroe Rollins in his application for the policy.

One of the "Conditions" stated in the policy, as a part of the contract evidenced thereby, was as follows:

"No obligation is assumed by the Company prior to the date

hereof, if the Insured is not alive or is not in sound health on the date hereof; or if before the date hereof, the Insured has been rejected for insurance by this or by any other Company, order or association, or, before said date, has had any pulmonary disease, or chronic bronchitis or cancer, or disease of the heart, liver or kidneys, unless such rejection or previous disease is specifically recited in the 'Space for Endorsements' in a waiver signed by the Secretary, then, in any such case, the Company may, within the contestable period, declare this Policy void and the liability of the Company shall be limited to the return of premiums paid on the Policy.''

█ The provision of the policy just quoted was valid, and was binding on the insured. Metropolitan Life Insurance Co. v. Chappell, 151 Tenn., 299, 309, 269 S. W., 21; Commonwealth Life Insurance Co. v. Anglin, 16 Tenn. App., 530, 534, 65 S. W. (2d), 239.

''The application of the condition in the policy that the defendant assumed no obligation, unless the insured was in sound health at the date of the policy, is not controlled by the insured's knowledge or lack of knowledge that she was not in sound health. The existence of life and sound health in the insured, at the date of the policy, was a condition precedent to the promise of insurance.'' Metropolitan Life Insurance Co. v. Chappell, supra, 151 Tenn., 299, page 310, 269 S. W., 21, 25.

''It is the fact of sound health of the insured which determines the liability of defendant under such a provision as is contained in the policy sued on, 'not apparent health, or his or any one else's opinion or belief that he was in sound health.' If the assured was in fact not in sound health, as that term is construed, either at the time the application was signed or at the time the policy was issued and delivered, there could be no recovery under the provisions of the policy sued on.'' Commonwealth Life Insurance Co. v. Anglin, supra, 16 Tenn. App., 530, page 537, 65 S. W. (2d), 239, 243.

█ The phrase ''sound health,'' as used in the policy under consideration, ''does not mean perfect health, or imply absolute freedom from bodily infirmity or tendency to disease, but means generally the absence of any vice or disease in the constitution of a serious nature, or that had a direct tendency to shorten life, as contradistinguished from a temporary ailment or indisposition.'' Metropolitan Life Insurance Co. v. Chappell, supra, 151 Tenn., 299, page 310, 269 S. W., 21, 24.

The record shows that before the trial the defendant tendered to the plaintiff the amount of the premiums paid ($4.50), and that the tender was continued by payment into the court at the trial. The sufficiency of the tender (if the defendant is otherwise not liable on the policy) is not questioned.

Monroe Rollins died at the Vanderbilt Hospital in Nashville on

November 17, 1933. He was treated in his last illness by Dr. Don Flickinger, assistant resident physician at Vanderbilt Hospital, who, together with other physicians on the Vanderbilt Hospital staff, conducted a post mortem examination and "autopsy" upon the body of Monroe Rollins, and Dr. Flickinger's testimony shows the record of the "findings of the autopsy," to which he agreed, as follows:

"Q. Read the findings of the autopsy. A. (Reading): 'Anatomical Diagnosis. Chief Diagnosis; Cardiac hypertrophy, or enlargement. Cardial dilatation.'

"Q. That is all heart trouble, is it not? A. Yes, sir. 'Aneurism of arch of aorta.' That is the large blood vessel. 'Pulmonary congestion. Carcinoid of cecum. Metastatic carcinoid of liver. Chronic passive congestion of the liver. Adenoma of the pancreas. Thrombosis of middle cerebral artery. Perforating ulcers of the feet. Anthracosis of lung. Aortitis, syphilitic.'

"Q. Just in explanation of that, all those are diseases, are they not? A. Yes, those are all organic conditions found in the organs.

"Q. And in most cases chronic, is that what you stated? A. They are designated as being either acute or chronic.

"Q. And that means extending over a period of time, does it not? A. Yes, sir.

"Q. Not something that is sudden or unexpected? A. Chronic means existing over a long period of time."

We quote further from the examination of Dr. Flickinger as follows:

"Q. Do you know of your own knowledge what that autopsy showed, his condition existing at the time of his death, what diseases he had? A. Yes, sir.

"Q. Doctor, what did you all find that caused the insured's death, Monroe Rollins? A. That is always difficult to state exactly.

"Q. Yes, what did you find existing in the condition of the body, after death? A. We found primary condition of dilatation or enlargement of the heart.

"Q. There was a dilatation or enlargement of the heart? A. That was a primary condition. That was the most striking condition. Then there was what we call an aneurism or dilatation of the arch of the aorta.

"Q. That is the muscles of the heart? A. The aorta is the large main blood-vessel that comes off the heart, and this in a portion shortly after it left the heart was diseased and the muscular coats of the blood vessel had given way and formed what we call an aneurism, or it is really a dilatation and an enlargement of that blood vessel. . . .

"Q. The trouble you found on that autopsy in this case, could that have been disclosed by a physical examination? A. Yes, that

trouble was picked up by all members of the house staff that examined that person before death. . . .

"Q. Doctor, you have stated, if I remember that there was a rupture in the heart muscle, was that? What was that—dilatation? A. No, sir, there was no actual rupture of the heart muscle. The heart muscle was somewhat enlarged, showing that the heart had evidently been not working as efficiently as a normal heart would.

"Q. And that was sufficient to cause death? A. That is something that it is difficult to say. In certain facts of heart conditions, notably this type of heart condition in which there is disease in this large blood vessel that leaves the heart, namely: the aorta, in a certain per cent of these cases there are sudden deaths, and with no obvious cause of death disclosed at post-mortem. In other words, if I can make myself clear, that the picture that the heart presents at the time of death does not in itself give the cause of death, and we presume different theories, but we cannot prove that due to a disease in this large blood vessel that certain infection can set up which caused the stoppage of the heart, and a disordered action of the heart muscle, which causes death. . . .

"Q. Doctor, what other conditions of the body, organic trouble, were found to be existing at the time of the autopsy, that was unusual? A. There were several other conditions. There was thrombosis, or blood-clots in one of his cerebral arteries, or one of his brain arteries; there were scattered areas of pneumonia throughout his lungs, and there were still remnants of the ulceration of his feet, and that was the primary picture of disease there. . . .

"Q. When did you first see the patient, Doctor? A. I saw him when he entered the second time, in 1933, on November 14th.

"Q. And did you see him at that time? A. Yes, sir.

"Q. Did you ask him about his case? What history did he give you of his past illnesses? A. At that time he gave me a history of his fracture, of some shortness of breath on exertion, some sitting up at night with a choking for breath, and cough; he was rather indefinite about how long it had been, but between one year and eighteen months previously.

"Q. But it was then in existence a year, he said? A. Yes, that's what he said.

"Q. His memory was a year? A. Yes, sir, and very recently in the week before any of these symptoms had become more severe, causing him to sit up for breath almost every night with this cough, and this had progressed in severity to the extent that he sought aid in the hospital.

"Q. Now, Doctor, in line with your first testimony as to heart trouble, from what he told you, and from the autopsy, in your opinion how long do you think that condition had existed? A. In my opinion the condition had existed at least eighteen months.

"Q. And at least eighteen months before his death? A. Yes, sir.

"Q. Now, Doctor, do you, as a physician, consider that a serious impairment of health? A. The trouble that I diagnosed?

"Q. Yes, sir? A. Yes, sir.

"Q. Would you say that the man had been in sound health for the period that you have just said, a year or eighteen months that that trouble existed? A. No, I wouldn't say that he was in sound health.

"Q. Doctor, I think you stated that a person is liable to die at any time with that condition. He might die very suddenly? A. Yes, sir."

The above-quoted testimony of Dr. Flickinger is undisputed, and it is clear that Monroe Rollins was not in sound health at the date of the policy in suit (July 10, 1933) approximately four months before his death, and that he was, both before and after that time, afflicted with some of the diseases mentioned in the "Conditions" of the policy hereinbefore quoted.

As before stated, the Insurance Company interposes, as a further defense to plaintiff's action, the contention that the insured, Monroe Rollins, made certain false representations and statements in his written application for the policy in question, which application was signed by him on July 1, 1933.

These alleged false representations are contained in the answers to the three questions numbered 9, 23, and 26 in the application, which questions, with the answers thereto, are as follows:

"9. Are you in good health? Yes.

"23. What illness, injury or accident have you ever had? Give details. Flu, 1917, sick three weeks, fully recovered.

"26. Have you ever had heart disease, asthma, tuberculosis,. cancer, ulcers, diabetes, fits, kidney disease, syphilis, paralysis,. rheumatism, sciatica, vertigo or illness or disorder of the brain, lungs, spine or nervous system, or any disease not common to both sexes; or suffered the total or partial loss of a hand, foot, eye, or the use thereof? Are you deformed? Do you use intoxicating liquors, morphine, or other narcotics to excess? If yes, give particulars. No."

The undisputed testimony of Dr. Flickinger hereinbefore stated (which we need not repeat) shows that the applicant's answers to the questions above quoted, particularly questions 9 and 26, were untrue. The answer to question 23 was misleading, in that, it suppressed material facts known to the applicant with respect to his previous illness and injuries.

The mere fact that false representations were made in the application is not, without more, sufficient to avoid the policy. It is provided by statute that, "no written or oral misrepresentation

or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his' behalf, shall. be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increase the risk of loss.'' Code, section 6126.

If the application contains false representations which ''increase the risk of loss,'' such misrepresentations will be deemed material, and will ''defeat or void the policy or prevent its attaching,'' whether made ''with actual intent to deceive'' or not. When it has been determined that the answers of the applicant were untrue, it becomes a question of law for the court as to whether such misrepresentations constitute matter increasing the risk of loss; and a misrepresentation about any matter of sufficient importance, in the opinion of the court, to naturally and reasonably influence the judgment of the insurer in making the contract, is a misrepresentation that ''increases the risk of loss'' within the meaning of the above-quoted statute. Mutual Life Insurance Co. v. Dibrell, 137 Tenn., 528, 529, 194 S. W., 581, L. R. A., 1917E, 554; Volunteer State Life Insurance Co. ·v. Richardson, 146 Tenn., 589, 244 S. W., 44, 26 A. L. R., 1270; Hughes Bros. v. Aetna Insurance Co., 148 Tenn., 293, 301, 255 S. W., 363, 366; National Life ꞁ& Accident Insurance Co. v. American Trust Co., 17 Tenn. App., 516, 542, 545, 68 S. W. (2d) 971.

We are of the opinion that the diseased conditions of Monroe Rollins which were misrepresented in his application would certainly ''increase the risk of loss,'' and such misrepresentations were naturally and reasonably calculated to affect the insurer's judgment in determining whether or not to issue the policy.

As we understand the briefs and argument for plaintiff, it is not seriously contended that there is any material evidence from which it could be found that Monroe Rollins was in ''sound health,'' at the date of the policy here in question, or that his answers to questions 9 and 26 in his application were true. The insistence on behalf of plaintiff is that defendant Insurance Company waived that condition of ''sound health'' and is estopped to question the misrepresentations in the application, by reason of its knowledge of certain facts with respect to the physical condition of the applicant in the year of 1927—approximately six years prior to the application for and the issuance of the policy now in controversy.·

The comments of the learned trial judge in the course of argument of defendant's motion for peremptory instructions, and the trend of his charge to the jury, indicate that he regarded the matter of waiver and estoppel as the determinative question in the case. It seems clear that the defendant Insurance Company was entitled to

peremptory instructions in its favor, unless there was sufficient evidence of a waiver on its part to take the case to the jury.

█ . Representations, warranties, and conditions, in connection with life, health, and accident risks, may be waived by the insurer, or, to state the same proposition in different language, the insurer may become estopped to set up the falsity of representations and the breach of conditions or warranties. Couch on Insurance, vol. 4, section 885i, page 3004; 37 C. J., pp. 405, 406, sections 81, 82; Stubblefield v. Mutual Benefit Health & Accident Association, 11 Tenn. App., 411, 414, 415.

It appears that defendant Insurance Company issued three small policies of industrial insurance on the life of Monroe Rollins prior to the issuance of the policy now in question. These three policies were issued on July 13, 1914, November 8, 1915, and August 9, 1920, respectively, and they (or one or more of them) contained health and accident insurance contracts, under which the defendant had paid "disability benefits" to the insured during his lifetime.

Defendant acknowledged its liability and paid the three policies above mentioned upon the death of Monroe Rollins.

It appears from the testimony of R. K. Evans, "head of the Death Claim Department" of the defendant Insurance Company, that defendant paid "disability benefits" to Monroe Rollins in January, February, and March, 1927, and November, 1933. The substance of Mr. Evans' testimony on this point is embraced in the following quotation therefrom:

"Q. Can you from that file or from any other file that you have show whether or not your Company paid this deceased any disability benefits? A. I can, yes, sir.

"Q. We would like to have that.

"The Court. All right, supply that, and the dates of payment, what it was for, and everything.

. "A. Do you want me to read these dates of disability benefits?

"The Court. Yes, the dates, and what the payments were made for.

"A. All right. March, 1927, four weeks benefits, ulcer of foot or feet; January 19, 1929.

"The Court. Who is the doctor? A. Dr. Mathieu.

"Q. Does it make any reference there as to whether he was making public claim? A. No, sir.

"Q. All right. Go ahead. A. January 29, one claim, second degree burn.

"Mr. Adams. Q. Does that mean one week, 'one claim?' A. One week, yes, sir. February, 1929, one week, there are two weeks, February, 1929, second degree burn; October, 1933, five claim, five weeks, fracture of tibia. November, 1933, one claim, same; fracture of tibia. That is the record. . . .

"Q. Now, Mr. Evans, these claims, are those included with a letter from the hospital, are they not? A. Yes, sir.

"Q. Mr. Evans, I will ask you if on this claim that had been made by the doctor, what is the statement on that claim there?

"Mr. Trabue. What claim is that?

"Mr. Tyne. That is the claim that he filed.

"Q. The date on that? A. 1927, Vanderbilt Hospital writes a letter rather than fills out our Disability claim. Claim of disability of people receiving treatment at that institution. This letter from the Vanderbilt Hospital is dated February 22, 1927. Signed by A. K. Mathieu, Assistant Superintendent, writes as follows:

" 'I hereby certify that Monroe Rollins, of 2012 Jefferson Street, was treated in our dispensary from January 10th to February 14th. On February 14th was admitted to the Hospital, where he is still a patient.

" 'Diagnosis: Ulcers of feet.

" '(Signed) H. A. Mathieu, Superintendent.'

"The Court. What year is that? A. February 22, 1927.

"Q. When was that filed with you? Back when those claims were paid? A. Yes, sir, when they were paid.

"Q. That is when those sick benefits were paid, when he made claim with you under one of the policies? A. Yes, sir, that's right. We endeavored to obtain additional information from hospital records, and the report came to us that the records are not available.

"Mr. Adams. I don't understand.

"A. We endeavored to obtain additional information from the hospital, but it was reported to us that the records were not available.

"The Court. Q. That was before you wrote this last policy, in July, 1933? A. This was in 1927.

"Mr. Adams. I think this gentleman is still on Direct examination. I want to object to his answer unless he personally interviewed the authorities at Vanderbilt Hospital, and whether or not he had that of his own knowledge.

"The Court. As I understand, this information that came to their files was in their files at the time this last policy was written.

"Mr. Adams. Yes, he asked him about that, and about these claims, but he says 'We undertook to get additional information.'

"A. I am of course testifying from records.

"Mr. Tyne. He is testifying from records.

"The Court. That came to them—the information.

"Mr. Tyne. I would like to read the rest of this.

"A. We have noted on the bottom: 'O. K. for this claim. Records at the hospital unavailable.'

"Mr. Adams. That is my mistake. I thought he was testifying from recollection and not from the paper.

"Mr. Tyne.   Q. Make that an Exhibit to your testimony.   A. I do.

"Q. From these claims there is nothing to show anything except ulcers of the feet, is that right?   A. That is so."

The claimed waiver or estoppel upon which plaintiff relies is based upon the information acquired by defendant in 1927 that Monroe Rollins was then afflicted with "ulcers of feet," together with a certain statement made by him to defendant's agent at the time the application for the policy in suit was prepared on July 1, 1933, which last-mentioned statement appears from the rebuttal testimony of the plaintiff, Fannie Lewis.

In order that the rebuttal testimony of Fannie Lewis may be better understood, a brief statement of certain testimony of J. T. Jakes, a soliciting agent of defendant from June, 1932, to October, 1933, will be made. This witness identified the application exhibited and filed as a part of his testimony as the application upon which the policy in question was issued, and he stated that he asked the applicant all the questions in the application and wrote the answers as they were given to him by the applicant, and that the application was then signed by the applicant, Monroe Rollins, in the presence of witness.

The witness Jakes stated that when he took said application he had no knowledge or information that Monroe Rollins was sick or diseased, and had no reason to believe that he was not in sound health, or that any of his answers "might be misrepresentations." He stated further that he took said application at the home of the applicant, late in the afternoon, after the applicant "came home from work," and that witness knew that the applicant had other insurance with defendant company because witness had collected premiums on the other policies.

Monroe Rollins was a married man, but had not lived with his wife for about ten years before his death. He was living with his sister, the plaintiff, Fannie Lewis, at the time he applied for and procured the policy involved in this case.

On direct examination, Fannie Lewis testified that she was at her home at the time Mr. Jakes took the application of her brother for the policy in question, and that she heard Monroe Rollins tell the insurance agent that "he was out at Vanderbilt in 1927" and "stayed there four weeks."

With reference to her statement just mentioned, Fannie Lewis was asked and answered further, on cross-examination, as follows:

"Q. Now I didn't understand your statement as to what you heard Monroe tell the agent; what did you say you heard him tell the agent?   A. Well when the agent asked him had he been sick, he told him when he got burned, he had been to the Nashville

hospital, and he told him when he had the flu and he told him when he was out at the Vanderbilt hospital four weeks.

"Q. Did he tell him what he was at the Vanderbilt hospital for? A. I don't know because I was ironing, I was on the porch and I was in and back getting the irons, and out of the kitchen, and when Mr. Guthrie would want to know, he would ask me.

"Q. You don't know whether he told him he was in the Vanderbilt hospital or not? A. I heard him tell him that.

"Q. You heard him tell him he was burned? A. Yes, sir.

"Q. You heard him tell him he had the flu in 1927? A. Yes, sir.

"Q. But you didn't hear him tell what he was in the Vanderbilt Hospital for? A. No.

"Q. Did you ever hear him tell him he had heart trouble? A. No, sir.

"Q. Ever hear him tell him he had venereal disease, or any sort of disease? A. No, sir, I didn't hear him tell him that.

"Q. Did you ever hear him tell him that he had any sort of liver trouble? A. No, sir.

"Q. No kind of disease? A. No, sir, I never heard him complain of nothing until after he complained he got hit with that automobile and then he only complained of the back of his head.

"The Court. Did you ever hear him complain of any kind of disease? A. No, sir.

"Mr. Tyne. Q. Did you hear him tell him he was fully recovered at that time? A. No, sir.

"Q. So you don't know whether he did tell him that or didn't tell him that? A. I didn't hear him tell him.

"Q. Did you hear Mr. Jakes ask him the questions? A. Ask him that question?

"Q. The questions under the application? A. If he did I don't remember no more than what I told you about being sick, like that.

"Q. I say did you hear Mr. Jakes ask Monroe the questions under the application? A. No, sir, I didn't hear him.

"The Court: She doesn't know what you mean by the application, I reckon.

"Q. When he came there to get this insurance from your brother and some statements were made, did you hear him ask him the questions that he asked?

"A. The only questions I heard him ask was the last time he was sick and who his doctor was, and things like that, that is the only questions I heard him ask. . . .

"Q. Fannie, you were in and out of the room all the time? A. I was ironing, yes, sir, in the middle room, they were on the porch.

"Q. You don't know what explanations were made by your brother, or what questions were asked by the agent, except what

you heard when you were in the room? A. That is all except what I heard.

"Q. They were there for a few minutes and there were questions and answers passing back and forth between the two? A. That is what I say.

"Q. You don't know what all went on and what explanations were made or given? A. No, sir, because I didn't hear all of it."

It is seen that the sum and substance of Fannie Lewis' testimony on the point indicated is that Monroe Rollins told defendant's agent at the time the latter took the application (on July 1, 1933) (that is, for what illness, disease, or injury) he was in the hospital weeks in 1927; but Fannie did not hear Monroe tell the agent why (that is, for what illness, disease, or injury) he was in the hospital at that time.

However, as heretofore stated, the defendant had in its files information that Monroe Rollins had been a patient in Vanderbilt Hospital in 1927 for "ulcers of feet," which fact had been disclosed to defendant by the "proofs" presented in support of his claim for disability benefits under previous policies.

Upon the foregoing facts, the question for decision is, whether or not the defendant Insurance Company is estopped to rely on its defenses before stated, because of its knowledge that Monroe Rollins was afflicted with "ulcers of feet," and was treated therefor in Vanderbilt Hospital in the year of 1927.

The substance of the argument for plaintiff, on the question of waiver and estoppel, seems to be that ulcers of the feet are suggestive of syphilitic infection, and therefore defendant was charged with notice that Monroe Rollins had syphilis, and, having syphilis, was not in "sound health"; and, further, that by reason of this fact, defendant knew when it issued the policy in question that the answers to questions 9 and 26 in the application of Monroe Rollins were untrue.

The proof shows that defendant paid the disability benefits in 1927 upon the certificate of Dr. Mathieu that Monroe Rollins was then under treatment in Vanderbilt Hospital for "ulcers of feet," and it also appears that the hospital records were not available to the defendant.

With reference to the significance of Monroe Rollins' "ulcers of feet" as shown in the Vanderbilt Hospital records of 1927, Dr. Flickinger testified as follows:

"The Court: Q. You speak of ulcer of the feet; your record there shows that it existed back in 1927, don't it? A. Yes, sir.

"Q. And that would suggest to you that there might be some venereal trouble, did it or not? A. Of course I was not here at that time.

"Q. Might have raised that question in your mind? A. That might very well, yes, sir.

"Q. But, Doctor, as regards the ulcerated feet, unless a further report is made as to what type of ulcer—just use of the expression ulcer of the feet would not indicate any venereal disease, would it? A. No, sir.

"Q. That is, a diagnosis by a doctor, without a suggestion of venereal disease, by just using the words ulcer of the feet, would not indicate venereal disease, would it? A. No, sir.

"Q. If you had got a statement to that effect, you would not conclude there was venereal disease unless there was a further diagnosis of the disease? A. I would not conclude that."

Dr. Flickinger further testified that the Vanderbilt Hospital records showed that Monroe Rollins was subjected to the "Wasserman test" while at the Vanderbilt Hospital in 1927, and that the result was "negative," which was evidence that he did not then have syphilis, although not necessarily conclusive evidence.

The plaintiff introduced, in rebuttal, Dr. Shands, house physician at the Protestant Hospital at Nashville for two months prior to the trial below, from whose testimony we quote as follows:

"Q. Doctor, it has been testified to in this case that the deceased spent four weeks in the Vanderbilt Hospital in 1927, with ulcers on his feet; assuming that is true, what would be the natural inference to be drawn as to the cause of those ulcers, by a physician who was informed of that fact? A. Well in the colored race in the South, I think one of the first things you would think of, very strongly think of, would be syphilis.

"Q. Is that a very common manner in which syphilis is evidenced? A. A very common manner, yes, sir, one of the symptoms. . . .

"Q. Doctor, does an enlarged heart and an aneurism result from syphilis in negroes? A. Yes, very frequently.

"Q. If you were a doctor in an insurance company located in this section of the country, where—

"Mr. Tyne. Your Honor please, I object to that kind of a question.

"The Court: I don't know what his question is going to be, go on and get it out and then you can object, when he completes his question. (Question read.)

"Q. —where a great number of negroes lived, and it was brought to your attention that a negro man had spent four weeks in a hospital with ulcerated feet, what would be your judgment as to what was the matter with that negro man? A. As I stated earlier, I would suspect syphilis first. There are other things you could think of, of course, but I would put syphilis at first.

"Cross-Examination by Mr. Tyne.

"Q. Doctor, you say that, that last answer to Mr. Adams' question, you would suspect syphilis, but there might be other things, if I remember your answer, there might be other things or other causes or other diseases; what other diseases, as I understand, ulcers of the feet are just a symptom; am I right on that ? A. Yes.

"Q. And that the cause might be several diseases; what diseases cause ulcers of the feet? A. One of the most frequent causes of ulcers of the feet and legs, are varicose veins.

"Q. Are they serious in themselves, Doctor? A. Well they are not endangering to life; but they are discomforting.

"Q. What other causes of ulcers of the feet? A. Any ulcers of the feet, varicose veins and syphilis are by far the predominating causes, there are other things, burns, accidents, and things like that.

"Q. A burn might cause ulcers of the feet? A. Yes, acid burns, or fire burns.

"Q. Except for syphilis, ulcers of the feet would not indicate anything serious, I mean the usual case of ulcers of the feet? · A. Yes, that is right.

"Q. So unless one was advised that either by a prior Wasserman test or from other knowledge, except just the fact that one had ulcers of the feet, it would not indicate their life was endangered, or that they were in a serious condition? A. If you eliminated syphilis, if you ruled out syphilis?

"Q. Yes, and unless there was information that there was syphilis, you would not necessarily suspect syphilis? A. You would suspect syphilis first. If you could possibly rule that out of your mind by a Wasserman test, you would say the patient's life is not in immediate danger at least."

It is seen from the testimony of the two medical witnesses quoted that ulcers of the feet may result from a variety of causes, and may be temporary, and Dr. Shands' testimony is, in substance, that if syphilis can be "ruled out" by a Wasserman test, such ulcers would not be considered a symptom of a serious disease.

If the defendant had obtained access to the records of Vanderbilt Hospital in 1927, it would have found that, in the Monroe Rollins case, syphilis had been "ruled out" by a Wasserman test, and, likewise, if the agent (Jakes) had pursued the inquiry suggested by the statement of Monroe Rollins, that he had been in Vanderbilt Hospital for four weeks in 1927, he (Jakes) would have learned (if allowed access to the hospital records) that Monroe Rollins had "ulcers of feet" in 1927, but that he had been given the Wasserman test and that the result was "negative," that is, it indicated that he did not have syphilis; hence there was no sufficient reason to attribute the ulcers of his feet (which to outward observation had healed in 1933) to any serious disease.

■ We are of the opinion that the defendant Insurance Company obtained no information, either from the proofs of disability in 1927 or from the statements of Monroe Rollins to the agent (Jakes) in 1933, which estopped it to rely upon the condition of "sound health" in the policy or the misrepresentations in the application which increased the risk of loss. Life & Casualty Insurance Co. v. King, 137 Tenn., 685, 703, 704, 195 S. W., 585; American National Insurance Co. v. Taylor, 13 Tenn. App., 134, 140; Metropolitan Life Insurance Co. v. McGowan, 2 Tenn. App., 341.

"The doctrine of waiver, as asserted against insurance companies to avoid the strict enforcement of conditions contained in their policies, is only another name for the doctrine of estoppel. It can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct and enforce the conditions. To a just application of this doctrine it is essential that the company sought to be estopped from denying the waiver claimed should be apprised of all the facts; of those which create the forfeiture, and of those which will necessarily influence its judgment in consenting to waive it." Globe Mutual Life Insurance Co., of New York v. Wolff, 95 U. S., 326, 333, 24 L. Ed., 387, 390.

It follows from what we have said that the defendant's first and third assignments of error are sustained. The judgment of the circuit court is reversed, the verdict of the jury is set aside, and the plaintiff's suit is dismissed.

Inasmuch as we hold that the case should not have been submitted to the jury, the assignments of error relating to the refusal of requested instructions to the jury become immaterial and need not be considered.

The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff, Fannie Lewis.

Crownover and DeWitt, JJ., concur.