JETT v. LIFE & CASUALTY INS. CO.—109 S. W. (2d), 104.

Eastern Section.   December 19, 1936.

Petition for Certiorari denied by Supreme Court, October 3, 1937.

J. F. Wheless, of Chattanooga, for plaintiff in error.

Sizer, Chambliss & Kefauver, of Chattanooga, for defendant in error.

PORTRUM, J. The verdict in this case was directed by the trial judge upon the sole ground that the insured was not in sound health at the time of the application for the policy and when the policy was issued and delivered. This was the issue raised in the motion for a directed verdict, and sustained by the court. This issue is determinative of the lawsuit if the trial judge correctly sustained the motion, but, if he erred, there must be a new trial, regardless of other issues raised by the plaintiff in error, and it follows that this is the sole question presented to this court for determination.

On May 28, 1929, the defendant company issued a life insurance policy on the life of Oscar Jett, Jr., age seven years, upon the application of his parents, with the plaintiff, Leatha Jett, named as beneficiary, payable upon the death of the insured while the policy was in effect. The amount of the policy was $890, and the consideration was the payment in advance of weekly premiums on each and every Monday, et cetera.

While this policy was in force, and on January 15, 1932, the witness Dr. Robert C. Robertson called to see the insured professionally and diagnosed his case as tuberculosis of the left hip joint; he treated this boy until December 14, 1932, when he operated upon him by taking a portion of the bone of his pelvis and grafted it across the hip joint with the purpose of making the joint rigid and to arrest the tubercular condition. Prior to the operation he had built up the general health of the patient and given him such treatment as was advisable in preparation for the operation. Following the operation, the patient remained in a plaster cast until April, 1933, and in May, 1933, a brace was applied and the brace gradually removed and completely discarded January, 1934. The doctor continued to visit him through January and up until September 29, 1934, which is the date he last saw him professionally. Upon this date he examined the patient and he testifies that the tubercular condition was arrested. He explains the technical difference between an arrested case and a cured case as follows:

"From a technical viewpoint, doctors differentiate between a cure and an arrest. By a cure we mean that a part is restored to its absolute normal, the same as it was before the injury or disease. From that viewpoint a cure is rarely obtained in anything. In other words, an injury will heal, will leave a scare, therefore it is not in anatomical sense a cure. On the other hand, a wound will heal, leaving a scar, you have a perfect function, and in that sense it is a cure, a cure in that sense of differentiation. In tuberculosis it is felt that tuberculosis is never cured in any part of the body in the sense that the part is the same as it was before the disease; in other words, a scare is left, or certain after-effects left, so that it is never as perfect as it was before the disease occurred. On the other hand, tuberculosis in different parts of the body always heals by the production of a scare, and in the cases of joints by the production of bone, so there is no motion in that joint. And we can see by various methods of examination in cases of joint tuberculosis there is no motion; and by other tests we can see no sign of disease within the joint. In other words, the disease has been replaced by bone, and that it has been present over a period of time. We then consider the case arrested."

The doctor states that in September, 1934, in his opinion the case was arrested, and that his opinion was borne out by X-ray plates, as well as physical examinations, and the patient's general appearance of good health. The doctor was cross-examined upon this point, being asked:

"I mean by an average, normal, healthy child, he was not in good health at that time?

"A. In a general way he appeared to be, yes, he did.

"Q. He was in good condition, considering the serious condition he had had? A. I made that statement on the fact that he was gain-

ing weight, in fact he had gained, in fact he was eating well, and I would state that his general condition was excellent and compared very well with any child of his age, insofar as we could tell.

"Q. So far as you could tell? A. That, of course, is omtting the stiff hip and stiff leg, his general condition was splendid so far as I could tell.

"Q. But you could not tell whether there was probably some little focal or infection in some bone? A. You must always be guarded when you say any case of tuberculosis is arrested. So far as we could tell it was arrested.

"Q. So far as you could see by the X-ray? A. By repeated X-ray examinations, be repeated physical examinations, by a gain in weight, by a usual appetite, we thought it was arrested. There is no way in which you can say a patient has active tuberculosis today, and tomorrow it is arrested—no one knows.

"Q. But, so far as you can tell in a case of tuberculosis of the bone, it looks like it might be arrested, then in a year or so the trouble might commence again? A. That is correct, it is a great problem in the treatment of tuberculosis.

"Q. What happens in a good percentage of cases, that is, there would be a recurrence of the old infection? A. Well, very often in bone cases if you have secured a solid bone union, so that motion is obviated in that particular joint, the thing you dread is not so much a recurrence in that joint, but a lighting up in some other part of the body.

"Q. Yes, some other joint? A. Not as a rule as a joint, some other part of the body.

"Q. When it comes into some other part of the body, it is directly or indirectly coming from the old arrested case, in the majority of cases? A. You are getting into a rather debatable, technical point there. Some feel that is the case; others feel that the original focus in the joint case comes from some other part of the body, so you are getting into a question to which no dogmatic answer can be given.

. . .

"Q. That is the reason you said you would keep him under observation for several years? A. I like to follow all cases of tuberculosis over a period of five years, possibly longer.

"Q. Why was it in September, 1934, when you state his case was arrested you said you wanted to keep him under observation for five years? A. That is routine in all my cases.

"Q. Why is that? A. I like to check their condition to see whether they continue satisfactorily, whether they continue to gain weight, or whether that disease comes out in some other part; whether the extremity holds where we grafted that bone or some deformity shows up; whether there is a relighting in the joint upon which the operation was performed. . . .

"Q. By that you recognize the infection might recur or some other infection might break out up to the period of four or five years? A. Or even longer, much longer."

The doctor then stated that the case was not cured, for there was scar tissue there and scars, and he again differentiates between a cure and an arrest.

From this testimony it is established that there may be a recurrence of an apparently arrested case, and that during the whole time the patient possessed a vice in his constitution which would eventually undermine his health or cause death. If a recurrence happened, then the case was not arrested, for the live germs were present, though apparently inactive.

We will leave the evidence here for a moment and follow the history of the case. In February, 1935, when the child was thirteen years of age, the parents allowed the policy to lapse for the nonpayment of the weekly premiums, and on April 6, 1935, the agents of the company went to the home of the parents and there revived and reinstated the policy, upon an application made by the parents, which application contained the usual form, to-wit:

". . . but such reinstatement shall not take effect, unless at the date thereof the insured is living and in sound health."

Upon this day the child was apparently in good health and was playing ball and marbles and was playing as other children do about the house. He went to school and Sunday school and had the appearance and activity of a normal healthy child. On May 19, 1935, or a little over thirty days from the revival of the policy, he fell sick and his case was diagnosed as that of tubercular meningitis; he was taken to the hospital on May 26 and died of the disease on June 4, 1935.

It was the purpose of the defendant's cross-examination of this professional witness to show the tubercular meningitis was but a recurrence of the active tuberculosis formerly in the left hip joint, and therefore at the date of the revival of the lapsed policy the insured was not in sound health. Defendant relies upon the following answers of this physician as establishing this condition:

"Q. Doctor, it is possible that this arrested condition of tuberculosis of the bone might have had some renewed activity, that is either in the bone that was affected when you saw it, or in some other part of the body, some of those germs might have been carried to this boy's meninges? A. It is.

"Q. And doctor, would you say that that is the likely thing that did occur in view of the fact that he had had this previous tubercular condition? A. I think it probably so.

"Q. That is, that is your opinion, that probably there was some little flare up, some recurrence of infection, either in the bone or

other part of the body from which tubercular bacteria was carried to this meninges? A. That is my opinion.

"Q. I believe you stated it was your opinion that this old condition there might have become active in itself, or active in some part of the body; that that is where the tubercular bacteria came from? A. That was my opinion."

It is noted that these questions are prefaced with the word "possible" or "probable," and the testimony to be here quoted made the use of these words necessary in interrogating the physician:

"Q. In order for a person to have tubercular meningitis, there first must be a focal infection, or focal point where tubercular bacteria are present, is that true? There must be tubercular germs somewhere in the body to be carried by the blood vessels to the meninges? A. That is debatable. We can answer that to this extent, there must be tubercular bacteria to be brought in contact with the meninges; though that may be inhalation through the base of the skull (through the mouth or nose into the throat and through the base of the skull), or by being carried by the blood stream, the two, probably, and most probably cover all cases of tubercular meningitis, either of these things might possibly occur."

We cannot quote at length from the testimony to develop this point further than to say that the doctor testified the boy could have become infected either in two or perhaps other ways; namely, from a recurrence of the old hip joint disease, or by inhaling the tubercular bacteria into his throat, where it found its way through the base of the skull into the brain or the covering of the brain known as meninges, and that these two sources probably cover all cases of tubercular meningitis.

So, when the doctor testified that it was his opinion that this was a recurrence of the old hip joint disease or tuberculosis of the joint, the words "probable" and "possible" were used to eliminate a positive statement that the disease was not caused by inhaling the tubercular bacteria, and the disease contracted in this manner. When the disease could have been contracted in one of two manners, then it becomes a question for the jury to determine in which manner the disease was contracted, and it is not permissible for the witness to usurp the function of the jury and state in which manner in his opinion the disease was contracted. Especially is this true when he gives no reason for his opinion, and he had testified that it could be contracted in either of these manners.

The court agrees that it is the law that this issue can be determined only upon expert or professional testimony, and the layman's testimony is without probative force, but this physician's testimony is not conclusive, and it does not establish that the insured was at the date of the revival of the policy in unsound health; on the other hand, the testimony establishes the fact that he may have, or

could have, contracted the disease by inhaling the germ after the policy was reinstated. If this be true, then there is no dispute, and, if the child did in fact contract this disease by inhaling tubercular bacteria, and it found its way through the base of the skull to the meninges, then it would be a miscarriage of justice for the court to arbitrarily say that the disease was but a recurrence of the tuberculosis of the joint. If the burden was upon the insured to show that he was in good health when the policy was revived, then he would have to exclude by evidence the possibility of the occurrence of the old disease, and, this not being done, his case would fail, but this burden is upon the insurance company, and it must show that at the date the policy was issued that the insured was not then in good health, and the evidence must exclude the possibility that the germs were later inhaled and the disease contracted before the company would be entitled to a directed verdict. Interstate Life & Accident Company v. Potter, 17 Tenn. App., 381, 68 S. W. (2d), 119.

The case of Commonwealth Life Insurance Co. v. Anglin, 16 Tenn. App., 530, 65 S. W. (2d), 239, is relied upon by the defendant as authority for its position. In that case the insured had a sarcoma, or cancer, removed from his eyelid and the operation was successful and it was thought it was not serious, but in a few months after the issuance of the policy the insured had a return of cancer which caused his death, and it was insisted that there was a showing of "a vice or disease in the constitution of a serious nature, or that has a direct tendency to shorten life." And the verdict should have been directed.

There is quite a distinction between the recurrence of a sarcoma and the recurrence of tuberculosis, especially in view of the fact that tuberculosis is a communicable disease, while cancer is not. But, even in the case of the cancer, the court held that it was a question for the jury to determine the cancerous condition was a recurrence of the old ailment, so that there was a vice within the system at the time of the application. The court declined to direct the verdict, but held this a question for the jury, and the writ of certiorari was denied by the Supreme Court. The facts of this case are much stronger, for it is a known fact that healthy children contract tuberculosis, and there is no reason why a child at one time afflicted with tuberculosis whose case was arrested may not again contract the disease from an independent cause. It is true that the tendency to contract the disease may be greater in a child who has once been afflicted with it, yet, if it is not inflicted with the disease at the time the policy was issued or reinstated, this tendency or natural weakness cannot destroy its contractual rights. There are no two persons whose resistance to disease is the same, and these contracts do not provide against tendency or weakness.

The later case of National Life & Accident Insurance Co. v. Lewis,

19 Tenn. App., 459, 89 S. W. (2d), 898, is also cited and relied upon. The issue presented in this case was one of waiver or estoppel, conceding that the insured was suffering from syphilis, diseased heart, lungs, etc., at the date of the issuance of the policy, but insisting that the insurance company knew of this physical condition and had waived the same. In this case there is an insistence upon a waiver by the plaintiff, but the court upon this appeal is considering but one issue and that is, Is it proven that the insured was not in good health at the date the policy was renewed?

The professional testimony does not exclude the possibility or the probability that the insured contracted the disease from which he died subsequent to the time the policy was renewed, then, at most, it becomes a question for the jury to determine in which way the child contracted the disease, if there be evidence introduced which removes the question as one of conjecture or guess; and in no event is the court justified in saying that the child was afflicted with tuberculosis at the date the policy was renewed and that meningitis was but a recurrence of the old affliction, to the exclusion of a new and independent infection from a foreign source.

The case must be reversed and remanded for a new trial at the cost of the defendant in error.

Ailor and McAmis, JJ., concur.