UMSTATTD v. METROPOLITAN LIFE INS. CO.—110 S. W. (2d), 342.

Eastern Section. Feb. 20, 1937.

Petition for Certiorari denied by Supreme Court, May 12, 1937.

Clayton Scyphers and Burrow & Burrow, all of Bristol, for plaintiff in error.

A. K. Morison, of Bristol, Va., and Caldwell, Brown & O'Dell, of Bristol, for defendant in error.

ANDERSON, J. This suit, twice tried in the circuit court, was instituted by Mrs. Alice M. Umstattd to recover upon a policy of life insurance covering the life of her husband, J. W. Umstattd, and naming her as beneficiary. The first trial resulted in a verdict and judgment for the plaintiff, which was affirmed by the Eastern Section this court and reversed by the Supreme Court. The suit was first dismissed as upon a directed verdict but upon the attention of the court being called to the fact that the defendant had assigned no error upon the action of this court in failing to sustain the motion for a directed verdict and dismiss the suit, the judgment for the plaintiff was reversed and the case remanded for a new trial.

The second trial resulted in a judgment dismissing the suit upon a directed verdict, and the question before us is whether this action was erroneous.

The policy was issued through the defendant's Bristol, Tenn., agents on November 14, 1929. The insured was then a resident of Bristol Tenn., but moved to Florida shortly thereafter. The premiums were due on the first day of each month, with a provision for a grace period of thirty-one days thereafter.

The premiums were paid regularly up to and including that due on July 1, 1931. No premiums thereafter becoming due were paid. The insured died on September 5, 1931.

Liability is resisted upon the ground that under its terms the

policy lapsed for failure to pay the August, 1931, premium during the grace period which expired thirty-one days after August 1, 1931.

To avoid the forfeiture plaintiff pleaded and sought to prove an agreement between the defendant's manager in charge of the Bristol office and Roy Umstattd, a son of the insured, whereby the former agreed, on behalf of the defendant, to notify the son before the expiration of the grace period in the event the insured failed to seasonably pay the premium and that said agreement had been breached thus precluding the defendant from relying upon the forfeiture for said default in the payment of the August, 1931, premium.

She further relied upon an alleged course of conduct with respect to giving such notice to the son as having estopped the defendant from insisting upon a forfeiture without having given notice to the son and made demand upon him for payment of the defaulted premium.

In reversing the former judgment the Supreme Court in a memorandum opinion by Mr. Chief Justice Green, after noting that the policy recited that "the company's agents have no authority to waive forfeitures, to alter or amend this policy, to accept premiums in arrears, or to extend the due date of any premium," held that: "Insofar as plaintiff's right of recovery rests upon the alleged parol contract between the local manager and Roy L. Umstattd, we think such contract was beyond the actual authority and beyond the apparent authority of the local agent. Insofar as plaintiff's recovery rests upon the theory that the insurance company is estopped by reason of a course of conduct from declaring a forfeiture for nonpayment of premium, we think that the course of conduct relied upon was not pursued for a sufficient length of time, nor under such circumstances as to raise an estoppel."

Upon the remand of the case the plaintiff amended her declaration so as to aver in substance that at the time the default in the payment of premiums occurred, the defendant had in its possession a sum of money belonging to the insured more than sufficient in amount to pay the defaulted premium and that it was the duty of the defendant to apply a sufficient amount thereof to prevent a forfeiture of the policy.

In response to a motion for a bill of particulars, the plaintiff averred that said sum consisted of funds going to make up the cash value of the policy and the divisible surplus accruing thereon.

The insured formerly worked for a firm in Bristol and was then covered by a group policy of insurance issued to his employer. When his employment terminated, he and his son, Roy, advised with Mr. Cates, who was then the defendant's local manager in Bristol, in regard to exercising the option provided in the group policy to convert the insured's coverage to an individual policy. It developed

that such a course would result in an increase in the premium, and apparently there was some doubt as to whether the insured would be financially able to pay the increased amount. In any event, according to Roy Umstattd's testimony, he then stated to Cates that he would pay the premiums when his father failed to do so, to which Cates responded that such an arrangement would be satisfactory and that ''when I was notified I could send my check there to the office.'' The policy was thereupon issued and delivered on November 14, 1929, and within a few weeks thereafter the insured moved to Florida, where he was employed in a department store; the son remaining in Bristol.

Roy Umstattd's testimony is that in response to notices from the Bristol office to the effect that his father had not paid the then current premium, he made four payments, one in January, 1930, one in February, 1930, one in June, 1930, and one in August, 1930. All other premiums up to and including that due on July 1, 1931, were paid by the insured by checks sent from his residence in Florida.

As before mentioned, the premium due August 1, 1931, was not paid, and the insured died on September 5, 1931, without any notice having been given the son of the default in the premium payment.

Cates was killed in an automobile accident on March 30, 1930. The cashier of the Bristol office, a witness for the plaintiff who had formerly been employed in the capacity of assistant cashier during the period here involved, testified that she had never been advised by Cates of any such agreement as that alleged to have been made with Roy Umstattd and that there was no record thereof in the Bristol office; that on two occasions only she had phoned Roy Umstattd that his father had not paid the premiums then due; that this was done near the end of the grace period; and that in response to this notice the premiums were paid by the son.

It is conceded by the plaintiff, and properly so, that this course of conduct was held upon the former appeal to be insufficient in nature and extent to estop the defendant from relying upon the forfeiture of the policy for nonpayment of the premium, under the rule announced in Ellis-Jones Drug Co. v. Home Ins. Co., 158 Tenn., 237, 12 S. W. (2d), 707, and the line of cases referred to therein.

It remains to be determined whether there was any evidence not adduced upon the former trial to warrant the conclusion that the making of the alleged agreement with Cates was within the scope of his apparent authority; it being conceded, tacitly at least, that he had no express authority to make such an agreement.

In two elaborate briefs filed on behalf of the plaintiff, it is insisted with much force and ability that in addition to the same evidence offered before, the present record contains at least some evidence that the agreement relied upon to avoid the forfeiture was not an unusual one and was according to a custom pursued by the de-

fendant and others in a like business, and hence it was at least a question for the jury as to whether the making of such an agreement was within the actual or apparent scope of the agent's authority and local manager.

It is insisted that the new evidence supplies the deficiency in the former record which the Supreme Court, in reversing the former judgment, pointed out in the following language appearing in the memorandum opinion disposing of a petition to rehear:

"We remain of the opinion that the record before us was without evidence to show that the contract relied on by the plaintiff below was within the actual or apparent scope of the agent's authority and that the record sent up was without evidence of a usage or custom, with respect to notice to the insured's son of default, that would bind the company."

It was shown by several witnesses that it was usual and customary for insurance companies including the defendant, to give notice of the maturity of the premium payments to those interested and to give a subsequent notice during the grace period if default was made. The defendant customarily gave the first notice from its home office. The second appears to have been customarily give from the Bristol office to policyholders within its jurisdiction.

It further appears to have been the usual practice of the defendant, in cases where defaults in the payment of premiums had been made, to have its agents call upon the policyholders in person and make every reasonable effort to prevail upon them to pay the premiums in order to "conserve the policy" in the interest of the defendant's business. It also appears that it was not unusual in connection with such efforts for its agents to contact relatives of the insured if they thought payment could be effected thereby. This course was followed at the instance of the defendant in an effort to promote its business interests but not pursuant to any contractual obligation so to do. Conceding this custom to have been definitely proven, it was not, under our conception of the opinion of the Supreme Court, evidence that the defendant's local manager Cates had the apparent authority to make an agreement binding on the defendant to give the insured's son notice prior to the expiration of the grace period of any failure of the insured to pay his premium. We construe the opinion of the court reversing the former judgment as so holding.

The nearest approach to showing that an agreement such as they relied upon was not unusual is found in the testimony of the witness Barr, who was district manager of the Pilot Insurance Company, and who was formerly employed by the defendant as assistant manager of its Bristol office.

The substance of Barr's testimony upon the point appears from

the following part of his direct examination, the objections of counsel being omitted:

"Q. If Mr. Cates, the district manager of the Metropolitan Insurance Company agreed to notify Roy Umstattd when his father failed to pay the premium and the grace period was about to expire would there be anything out of the way or unusual in such an agreement? A. Of course you know I didn't overhear such an agreement between them.

"Q. I am not asking you whether it was made, but if it had been made. A. I should say that the average insurance agent would make a promise under such circumstances to contact this party. Of course I do not know how binding that would be on the insurance company from any legal angle.

"Q. And that would not be unusual? A. I should say, from my knowledge along that line, that the average insurance agent would agree to contact a relative during the grace period of a policy to secure the business. I wouldn't consider that exactly unusual for an agent to do that. I don't of course pass on what importance that would be from any legal standpoint. That is, in varying the terms of the policy contract."

Upon the other hand, the witness, Church, the defendant's agency supervisor for southern territory located at the home office of the company, whose deposition was taken by the defendant but read by the plaintiff, testified that no district manager or agent had authority to make such an agreement; that during his connection with the company since 1924 he had never heard of such agreement having been accepted or ratified by the executive officers of the company who alone had the authority so to do; and that any such agreement, if made, would be a personal one on the part of the manager and not an agreement with the company.

He further testified as follows:

"Q. Haven't you stated a while ago that he had no authority to do this and to do that? (Referring to Cates, the local manager.) Suppose he had said this some time before; 'Now Roy, I understand that your father has gone to Florida and you have agreed to help him pay the premiums when he cannot pay them,' and that Roy said, 'I will pay it, but you will have to notify me. My father is in Florida and he may send a check, but if he should not send a check on the last day, I will notify you so you can come over here and pay it,' there would not have been anything unusual in that, would there? Would it then have been proper practice? A. I think that would have been unusual practice.

"Q. Do your agents ever try to collect premiums from members of the family where the insured does not pay the premium or is unable to pay it? A. I couldn't say.

"Q. What would be unusual about the proposition that you say

would be unusual? A. I believe the premium notice would be sent to Mr. Umstattd in Florida.

"Q. That is true. A. If Mr. Umstattd sent the premium notice to his son with instructions to pay it, then I do not see but why it would not be in order to accept it.

"Q. The question I am asking you, though, is this: If the company sent the notice to Umstattd in Florida and he failed to pay, and if Cates had talked to the son, who said, 'If my father does not pay, I will,' don't you think it would be proper and right for Cates to say, 'Here, your father has not paid. If you want to save that policy, you will have to pay it,' Would that be unusual? A. No, it would not.

"Q. That would not be unusual? A. No.

"Q. That would be proper practice, wouldn't it? A. I wouldn't say that it would be proper practice.

"Q. Wouldn't it be good practice and show commendable energy on the part of the agent? A. In the interest of conservation, yes.

"Q. Haven't you instructed all of your agents to be vigilant in looking after the conservation of the company's business? A. Yes.

"Q. And to see that it does not fall off, or that the policies lapse? That is your instruction, isn't it? A. Yes."

■■ As said in a recent text, "apparent authority or ostensible authority, as it is also called, is that which though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing." 2 Am. Jur., pp. 82, 83. The principle of "apparent authority" is based upon the same elements as the authority created by the estoppel of the principal to deny the agent's authority. 2 Am. Jur., p. 86.

■■ The apparent authority for which the principal may be liable must be traceable to him and cannot be established solely by the acts and conduct of the agent; the principal is only liable for the apparent authority caused by himself; if the third person actually knows or should know the limitations upon the agent's authority, the principal is not bound by an act that is beyond such limitations. 2 Am. Jur., p. 85.

The policy in the instant case recites that it and the application "constitute the entire contract between the parties," and also that "the company's agents have no authority to waive forfeitures, to alter or amend this policy, to accept premiums in arrears, or to extend the due date of any premiums." Language to this effect appears in the policy twice, as was pointed out in the opinion of the Supreme Court, reversing the former judgment.

■ It is settled in this state that such provisions of a written contract may themselves be waived. Sugg v. Equitable Life Assur. Soc., 116 Tenn., 658, 94 S. W., 936; Co-operative Stores Co. v. U.

S. Fidelity & Guaranty Co., 137 Tenn., 609, 622, 625, 195 S. W., 177, and cases cited.

Unless waived, however, such provisions of a contract are binding upon the parties and convey notice of the limitation thus placed upon an agent's authority. Somerville v. Gullet Gin Co., 137 Tenn., 509, 194 S. W., 576; 2 Am. Jur., p. 81, and note 5 to the text.

All of our cases, so far as we are aware, giving effect to an agreement made by an agent contrary to, or beyond, such a limitation in the written contract, do so upon the theory that the principal, by reason of a course of dealing, was estopped to rely upon the contractual limitation. Ellis-Jones Drug Co. v. Home Ins. Co., 158 Tenn., 237, 12 S. W. (2d), 707, 709, and cases cited; 2 Am. Jur., page 86. As noted in that case, the court in the previous case of Independent Order of Foresters v. Cunningham, 127 Tenn., 521, 156 S. W., 192, 5 A. L. R., 1569, declared the fundamental basis of the doctrine of waiver and estoppel as applied to insurance contracts in these words:

"This doctrine does not grow out of the original agreement of the parties, but is based upon the conduct and dealings of the parties with each other in respect of the particular matter in controversy. It affects the conscience of the party whose conduct has led the other to a course of dealing to his injury, so that he is not allowed to predicate a right upon a former agreement inconsistent with his course of conduct. In practical effect, the conduct of the parties makes a new contract, the substance of which is that the society agrees not to insist upon the forfeiture clause. It is not meant that the parties formally agree to a waiver of the forfeiture clause, but that the courts will not allow the party claiming the forfeiture in violation of good faith and good conscience to set it up."

It will be noted that the conduct and the dealings of the parties with each other that will raise an estoppel must be "with respect to the particular matter in controversy," here, the payment of the premiums on the policy sued on. It was expressly held by the Supreme Court in the former review that there had been no dealings or course of conduct between any of the parties to this controversy that would raise an estoppel against the defendant.

There is no evidence to warrant the conclusion that the insured was unaware of the limitation upon the agent's authority contained in the policy or of the stipulation to the effect that the application and the policy constituted the entire agreement between the parties. The presumption is that he knew of, and agreed to, both provisions. The conduct and dealings between the parties "with respect to the particular matter in controversy" as disclosed by the present record is substantially the same as that referred to in the opinion of the Supreme Court reversing the former judgment. If, as was expressly held, such conduct was insufficient in nature and

extent to estop the defendant from relying upon the provision of the policy providing for forfeiture in the event of default in the payment of any premium thereon, then we think it must necesarily be so that such conduct was also insufficient to constitute a waiver of the express provision that the policy and application constituted the entire contract between the parties or that placing a limitation upon the agent's authority.

Moreover, it is an essential element of the doctrine of this character of estoppel that the party invoking it must have relied upon the conduct upon which it is sought to be predicated. 2 Pomeroy on Equity Jurisprudence, section 804. There is no evidence in this case that the plaintiff relied upon the agreement by which it is sought to avoid the effect of the policy provision providing for a forfeiture for the nonpayment of a premium. The alleged agreement and course of dealing relied upon to work the estoppel was with one who had no interest in the subject matter of the contract.

Again, it will be noted that the testimony of the witness Barr is with respect to what was not unusual in the practice of the average insurance agent. He did not testify that any such practice as that referred to was usual and customary among the defendant's agents; nor is there any other evidence to that effect, or that the executive officers of defendant, who alone had express authority to so contract in its behalf, had, or by the exercise of ordinary care could have had, knowledge of any such practice.

If, when viewed in the light most favorable to plaintiff, as it must be, it be considered that there was some evidence tending to show that the making by the average insurance agent of an agreement such as that relied upon was not unusual and that from this it could be inferred that it was customary among this defendant's agents, it would not be permissible to infer from the latter inference, that the defendant's officers knew about the practice. An inference cannot be drawn from an inference. Railroad Co. v. Lindamood, 111 Tenn., 457, 78 S. W., 99; Gulf Ref. Co. v. Frazier, 19 Tenn. App., 76, 83 S. W. (2d), 285, 301.

Even if there was evidence that defendant's agents knew of or followed such a practice or custom, it could not be said under the evidence in this record that their knowledge or conduct was imputable to the company; for to so hold would be to thereby predetermine the very question in issue, namely, the scope of the express or apparent authority of such agents. In other words, before such knowledge or conduct on the part of the agents could be imputed to the defendant, it would have to be shown by evidence aliunde that the knowledge was acquired or acts done while the agent was acting within the general scope of his authority, actual or ostensible. 2 Am. Jur., 286, section 368 et seq.; Hurst Bollin Co. v. Jones, 152 Tenn., 535, 541, 279 S. W., 392, 43 A. L. R., 742.

As stated before, the apparent authority for which the principal may be liable must be traceable to him and cannot be established solely by the acts and conduct of the agent. It must appear that the principal either knew of the acts of the agent relied upon to establish the scope of his apparent authority, or by the exercise of ordinary care and prudence he could have known thereof. 2 Am. Jur., 84, 85; Continental Ins. Co. v. Schulman, 140 Tenn., 481, 489, 493, 205 S. W., 315.

In the instant case it is clearly shown that the defendant required its agents to make every effort to obtain payment of a defaulted premium during the grace period, but we do not think that such a showing is any evidence to the effect that an agent had the apparent authority to make an agreement with a stranger to the contract or for that matter with the insured, to notify a third person in the event of the insured's failure to pay any given premium.

If, as stated, it be assumed that a practice to make such an agreement was not unusual, there is not only no evidence to the effect that the defendant was aware of that practice or that by the exercise of ordinary care it could have been known to it, but the only legitimate inference to be drawn from the testimony of the plaintiff's witness, Church, is to the contrary.

What we have said disposes of the contention of the plaintiff to the effect that the agreement relied upon was impliedly ratified. It is essentially true that there can be no ratification without full knowledge. Somerville v. Gullet Gin Co., supra.

The act of the agent in notifying the son upon four occasions that the premium had not been paid by the insured could not have operated as a ratification binding upon the defendant, because obviously if the agent had no authority to make the contract in the first place, he could not by carrying it out ratify it so as to bind the principal without the knowledge or acquiescence of the latter.

We hold therefore that there was no basis in the evidence for a conclusion that the agreement, relied upon as having been made between the defendant's local manager and the plaintiff's son, was binding upon defendant.

With respect to the case of Continental Ins. Co. v. Schulman, 140 Tenn., 481, 205 S. W., 315, relied upon by the plaintiff, we deem it sufficient to point out that the court was there dealing with an alleged oral contract of insurance and not with a written one containing an express provision that it and the application therefor constituted the entire contract. There the ostensible authority of the agent to make a contract such as was under consideration in that case was therefore under the facts of that case necessarily to be determined by custom. Although it there appeared that it was usual and customary for insurance agents such as those there involved to undertake parol contracts of insurance which were bind-

ing on their principals for the period between the application and the agent's first opportunity to write up the policy, a period of not exceeding a week, it was held that proof of such a custom was not sufficient to establish apparent authority in such an agent to bind the insurer by a parol contract of insurance for a period of more than two months. No question of waiver or estoppel was involved in that case, and hence we do not think it is in point.

As we view the instant case, the plaintiff cannot escape the binding effect of the policy provisions except upon the theory of estoppel or waiver, and we hold that there is no evidence in the record of conduct on the part of the defendant which would justify the application of that doctrine.

This brings us to a disposition of the contention set forth in the amendment to the declaration made upon the remand of the cause for a second trial to the effect that at the time default was made in the payment of the premium the defendant had in its possession a sum of money belonging to the insured, more than sufficient in amount to pay said premium.

It is first insisted in this connection that a cash value had accrued on the policy sufficient in amount to pay the defaulted premium and that it should have been so applied by the defendant. The policy provided for a "cash value" or a loan value after the payment of premiums for two full years. It also provided that after it had been in force for that period of time several options could be exercised by the owner of the policy by surrender thereof and a request in writing, within three months after the due date of any premium in default. One of these options was to receive the cash surrender value as indicated by a table of such values appearing in the policy.

It was further provided by the policy that at any time after premiums for two full years had been paid that, while the policy was in force, except when continued as nonparticipating paid-up term insurance, the company, on proper and lawful assignment of the policy and presentation of it for indorsement, would loan to the owner on the sole security thereof an amount not greater than the cash surrender value at the end of the current year.

There is no provision whatever in the policy, so far as we are able to discover, to the effect that the policy had a cash or loan value unless and until it had been in force for two whole years and premiums paid thereon for that length of time.

The policy in the instant case had not been in effect for two whole years.

It is insisted by the plaintiff, however, that by the payment of three more monthly premiums the cash value would have been approximately $275, and hence it is argued that at the time of the default on September 1, 1931, the cash·value of the policy was approximately $200, and this is the sum which it is contended should

have been applied to the payment of the defaulted premium. The accrual and availability of the cash surrender value on the policy was a matter of contract between the parties, and as above pointed out, there was no provision to the effect that any portion of the cash surrender value accruing during the first two years of the life of the policy would be available at any time short of that period.

Furthermore, the policy provided specifically for the manner in which the cash value should be disposed of in the event of a default in the payment of a premium, affording the insured the right to exercise one of the several options set forth and providing that if he did not avail himself of either of the options in the manner provided for, within three months after the due date of the premium in default, that the policy would be continued for a reduced amount of nonparticipating paid up endowment insurance. So, if at the time of the default in the payment of the premium the policy had had a cash value, since there was no exercise or attempt to exercise either of the options granted, the cash value would have automatically been applied as above indicated. This was a matter of contract as binding upon the company as it was upon the insured. Bumpus v. Life & Casualty Ins. Co., 167 Tenn., 412, 70 S. W. (2d), 30; Neighbors v. Union Central Life Ins. Co., 17 Tenn. App., 612, 69 S. W. (2d), 618. Nor are we able to see how Code, section 6179, subsec. 7, can be of any benefits to the plaintiff. That section requires that the policy shall contain a provision to the effect that after three full years' premiums had been paid the company at any time while the policy was in force would advance on the sole security thereof the reserve at the end of the current policy year and that the company would deduct from such loan value any existing indebtedness on the policy and any unpaid balance of the premium for the current policy year. It is doubtless true as contended that the insurer, as did the defendant in this case, might shorten the period of three years as specified by the statute, to a period of two years; but the fact nevertheless remains that there was no contractual obligation on the part of the defendant, either under the statute or under the policy, to apply the cash value of the policy to ''any unpaid balance of the premium for the current policy year'' unless and until the premiums had been paid for the specified period which was not done with respect to the policy in the instant case.

It is further insisted in this connection that the evidence shows a practice on the part of the defendant to offer and make loans on the security of the policy before the policy had been in force for two years, such loans being made for the purpose of enabling the insured to pay a premium or premiums. Apart from other reasons it is a sufficient answer to this contention to say that the insured made no effort whatever to obtain a loan on this policy; nor did he to any extent rely upon the practice of the defendant to make loans to be

used for the payment of premiums during the first two years of the policy and in anticipation of the future loan value provided for by the terms of the contract.

It is finally insisted that the policy had a "divisible surplus" belonging to the insured which should have been applied by the defendant to the payment of the August, 1931, premium with respect to which default was made.

This contention is based upon the following provisions of the policy:

"Participation in Divisible Surplus.—This policy is a participating contract while in force as a premium-paying policy, and the Company will annually, as of the thirty-first day of December of each year, ascertain and apportion any divisible surplus accruing hereon. (See "Notice to Policyholder" below). Such divisible surplus will be payable on the next anniversary of this Policy following the next succeeding thirtieth day of April and May, at the option of the insured, or of the Assignee of record, if any, be either (a) paid in cash, or, (b) applied within the grace period towards the payment of any premium or premiums; or, (c) applied to the purchase of a participating paid-up addition to the sum insured; or, (d) left to accumulate to the credit of this Policy at such rate of interest as the Company may declare on such funds; but not less than $3\frac{1}{2}$ per centum per annum, and payable at maturity of this Policy or withdrawable in cash on any anniversary date of this Policy. If no other option is selected by the insured, or by the assignee of record, if any, within three months after the date when such divisible surplus is payable, then the divisible surplus will be applied to the purchase of paid-up addition to the sum insured. Such paid-up addition may be surrendered at any time for a cash value at least equal to the amount of the surplus originally applied to its purchase.

"Notice to Policyholder.—The divisible surplus accruing under policies of this class will probably not be sufficient to enable the Company to make any apportionment under this policy before the end of the third year."

The obligation of the defendant under this provision was to ascertain and apportion "any divisible surplus accruing hereon." The undisputed evidence is to the effect that no surplus had accrued on or been apportioned under the terms of the policy here involved at the time it lapsed.

There was evidence to the effect that if the policy had continued in force for a period of three years the divisible surplus thereon would have been $9.61 per thousand. It appears to be the plaintiff's theory that this being shown, the amount should be prorated over the three-year period which would have resulted in an average amount of $1.20 per month. On this basis, the policy having been in force twenty-one months, the total amount accruing thereon would have

been $25.20, some $7.38 less than the amount required to pay the premium due on August 1, 1931. So, in this view of the matter the required payment could not have been made from the ''divisible surplus'' even if we should hold, which we do not, that it could be arrived at upon the basis contended for by the plaintiff, there having been no course of dealing between the parties that would justify the insured in believing that the divisible surplus would be so applied. Neighbors v. Union Central Life Ins. Co., supra.

In short, to uphold the plaintiff's contention as to the application of the alleged cash or loan value of the policy and the ''divisible surplus'' would be to make a contract between the parties which they did not make for themselves and this we cannot do. We do not think that the insurance business could be successfully conducted on such a basis.

The result upon the whole case is that we find no error in the action of the trial judge in directing a verdict for the defendant. The judgment is therefore affirmed, at the cost of the plaintiff.

Senter and Ketchum, JJ., concur.