# LIFE & CASUALTY INSURANCE COMPANY OF TENNESSEE, Original Complainant and Appellee, v. ANNIE M. JACKSON, Original Defendant and Appellant.—342 S. W. (2d) 720.

Western Section, Jackson. January 27, 1960.

Certiorari Denied by Supreme Court January 31, 1961.

28

Marvin J. Brode, Memphis, for original defendant-appellant.

Waring, Walker, Cox & Lewis, Memphis, for original complainant-appellee.

AVERY, Presiding Judge (W.S.). This suit originated in Division II of the Chancery Court of Shelby County, Tennessee, Honorable Ceylon Frazer, Chancellor. The parties will be designated herein as complainant and defendant, their original status below.

The original bill was filed by Life & Casualty Insurance Company of Tennessee, whereby it sought a decree to rescind and have declared void four life insurance policies issued to James Jackson, the husband of the original defendant, in each of which the defendant was made beneficiary, upon applications made in April, 1957. The insured killed himself by shotgun blast purposely fired by him on May 24, 1958, dying instantly.

The original bill was answered and a cross-bill filed by the defendant, Annie M. Jackson, by which cross-bill she sought recovery of the insurance set forth in each contract, plus penalty of 25% and interest, alleging bad faith upon the part of the insurance company.

The pleadings were amended and the case heard before the Chancellor upon oral testimony, depositions and stipulations, on the 31st day of March, 1959. The learned Chancellor rendered an oral Opinion, which is preserved and made a part of the record, on April 8, 1959, and the final Decree was rendered April 16, 1959.

All the policies were issued without medical examination and two of them were industrial life policies, containing no clause with respect to suicide. The applications for the respective policies contained the following questions, answers thereto, and clause:

"Q. 15. Is applicant in good health? A. Yes.

"Q. 18. Does applicant have any mental or physical defect or infirmity of any nature? A. No.

"Q. 21. Has applicant ever had apoplexy, asthma, bronchitis, cancer or other tumor, high blood pressure, disease of the heart, liver, lungs, stomach, or intestines, pus, albumen, or sugar in urine, or any

disease of kidneys, diabetes, epilepsy, insanity, jaundice, neuritis, paralysis, pleurisy, rheumatism, syphilis, spinal disease or tuberculosis? (If yes, give dates, details, duration, name of doctor or hospital.) A. No.

"Q. 22. Has applicant consulted or received medical or surgical advice or treatment, or had any illness not mentioned above within last five years? A. No."

"Applicant hereby applies for the above described policy (ies) of insurance, certifies that all statements and answers are true and complete and made to induce Life and Casualty Insurance Company of Tennessee to issue the policy (ies) applied for, and agrees that any policy (ies) issued pursuant to the application shall not be binding upon the Company unless upon the issue date thereof Applicant shall be alive and in sound health."

The industrial policies issued pursuant to said applications contained the following provisions:

"Within two years from the date of issue of this Policy, the liability of the Company under same shall be limited to the return of premiums if the Insured was not in sound health on the date of issuance and delivery of this Policy. After this Policy shall have been in force during the lifetime of the Insured for two years from the date of issuance, it shall be incontestable except for non-payment of premiums.

"* * * No agent of the Company may make or modify this contract or waive any of its terms, nor shall any change, alteration or modification of any

kind be made except by endorsement hereon signed
by the President, Secretary, Actuary or other Officer
of the Company.''

Without stating all the contents of the original bill,
after setting out the applications for and the issuance
of the policies, amounts, dates, etc.; that photostatic
copies of the policies and applications were filed as ex-
hibits to the original bill and the questions in the appli-
cations together with that part of same quoted on pages
29, 30 and 31 of this Opinion, the bill then alleges that the
insured at the time the application was signed had epi-
lepsy, was being treated for nervousness, had consulted
physicians, received medical advice and treatment over a
period of five years, and shortly before signing the appli-
cation, and that he was not at the time of signing said
application in ''good or sound health''; that the state-
ments made by the insured were false, untrue, and were
so known to him to be false and untrue, were material
misrepresentations, and that if complainant had been
advised of the true facts the policies would never have
been issued.

It further avers that these false statements were made
for the express purpose and with the intent to deceive
and done with ''actual intent to deceive and to fraud-
ulently induce the complainant to issue the four aforesaid
industrial insurance policies on the named insured with-
out a physical examination''. It then alleges that com-
plainant did not know the true facts until after the
insured had committed suicide and when claim was made
by the beneficiary of the policies, and after investiga-
tion revealed the facts as stated in the bill of complain-
ant, in accord with the provisions in the policies the
complainant tendered all payment of premiums which
had been made thereon in the amount of $81.69, which

tender was refused, and the same is now tendered with its bill to the Clerk of the Court.

The answer denied generally all the pertinent averments of the original bill, and cross-bill was filed seeking to recover on the policies. The original bill, answer, cross-bill and answer thereto, were amended so as to present all the material issues to the Court. The following stipulations were agreed to during the hearing:

"It was stipulated and stated in Court by counsel for Mrs. Jackson that no claim was being made on the two industrial accident policies, exhibits 3 and 4, by the Cross-complainant Mrs. James Jackson.

"It was stipulated the premiums paid on all four policies, exhibit 1 through 4 in the amount of $81.69 had been paid into the Chancery Court Clerk and was on deposit as a tender of premiums."

The Court found that the insured appeared before the agents of the complainant who took the applications only on one occasion, and as a result of that one occasion the applications were dated, one on April 15, 1957 and the other on April 29, 1957, each containing the identical questions and answers hereinabove set out. He then said:

"The Court does not consider that it is necessary that this Court consider the applications at all. The Court doesn't consider that it is necessary for the Court to pass upon whether there were misrepresentations in the application, that is which increased the risk of loss, or that any representations made were fraudulently made for the purpose of inducing the issuance of the policies."

He found, however, that the preponderance of the proof showed that the insured was not in good health, as provided by the terms of the policy, at the time he signed the applications and that the complainant discharged its entire obligation and liability under the contracts when it tendered the amount of the premiums paid. He quoted in his opinion the exact quotation last set out hereinabove, found that the cross-bill should be dismissed, and he further said:

"The Court thinks that under all the circumstances and facts of this case that the costs of this cause should be adjudged against the Complainant Insurance Company."

The Decree that was entered, after making the usual recitations, recited the following:

"It is therefore Ordered, Adjudged and Decreed that the original and amended bill as to the two industrial life insurance policies Nos. 19739465 and 19754242 issued by the complainant be and are hereby sustained and that liability of the complainant under said policies be and is hereby limited to return of premiums previously paid upon said policies.

"It is further Ordered, Adjudged and Decreed that the cross action upon the aforesaid industrial life insurance policies be and is hereby dismissed.

"It is further Ordered, Adjudged and Decreed that, the Court exercising its discretion, all costs are adjudged against the complainant, and the Clerk and Master will pay to the defendant and cross-complainant, Annie M. Jackson, or her solicitor of record, the tender of premiums made into the registry of this Court by the complainant and cross-defendant."

Exceptions were saved to the finding of facts and the Decree, appeal prayed, granted and perfected to this Court, and after oral argument in this Court, the cause taken under advisement and is now disposed of.

The errors assigned simply attack the Decree of the Court on the theory that there is no evidence to support it and that it is contrary to the law and facts of the cause under Assignments of Error I, II and III. Assignment IV is two-fold—first, it is leveled at the action of the Court in permitting introduction of the records of the Veterans Administration by one Ross A. Matthews, an attorney for the Veterans Administration and in charge of the records; and second, that the agent Booth, witness for the defendant, acting as agent for the complainant handled the taking of the applications in such careless and negligent manner that the complainant had waived its right to rely upon the good health clause contained in the contract and was therefore estopped to do so.

Upon this record, this cause is heard in this Court with the presumption that the facts as found by the Chancellor are correct unless the proof preponderates against such findings. T.C.A. sec. 27-303.

A part of the proof as shown by this record is by deposition, a part by oral testimony before the Court, and some parts by stipulation. The bill of exceptions of a portion of the oral proof taken before the Court is in narrative form.

The testimony of the witnesses for original complainant and cross-defendant, Harold Pennington, General Agent of the Industrial Division of original complainant; E. L. Rader, District Manager of the original complainant with his office in Memphis, Tennessee; E. E. Herring-

ton, Staff Manager working under E. L. Rader; Dr. Don Winfield, employed by Le Bonheur Hospital of Memphis, who gave insured the test referred to as an electroencephalogram; William E. Sayles, technician at Le Bonheur Hospital under Dr. Winfield; Ross A. Matthews, Veterans Administration Attorney and Officer Schumacker, is all in narrative form except the exhibits to the testimony.

The testimony of the original defendant, Annie M. Jackson, wife of insured; Raymond Densford, employer of the insured, and Doris Wheeler, a niece of the insured, is all in narrative form in this record, and the only other witness introduced by defendant and cross-complainant was Henry Booth, who at the time the application was taken was agent for the original complainant and cross-defendant. He testified orally and his testimony is in question and answer form.

That part of Assignment of Error IV attacking the competency of the evidence of the witness Ross A. Matthews, is hereby overruled because the record nowhere shows that the evidence is excepted to and no motion was made that it not be considered or to strike any part of it.

The proof is very clear that the insured was either 34 or 35 years of age; that he signed the applications for the respective policies of insurance; that he was an ex-service man; that the policies were issued on applications that did not require medical examination; that during the term of years from 1950 to April 14, 1958, he had consulted and been treated by four different doctors, viz., Dr. Edmund Utkov, Dr. Irwin C. Minkin, Dr. Justin Adler and Dr. Don Winfield.

The insured first consulted Dr. Edmund Utkov, who did not have a record of that first consultation but fixed the time as during the years 1950, 1951 or 1952, at which time insured informed Dr. Utkov that he had had an epileptic seizure shortly before that visit. Dr. Utkov prescribed medication for the epileptic seizures in order to control them. He was also treated by Dr. Irwin C. Minkin and seen by him first in July 1956 and three or four more times between that first visit and July 9, 1956; then on March 19 and 23, 1957; then on April 6, 13, 20 and 30, 1957; May 4, 7, 16 and 21, 1957; and July 12, 22, 23 and 26, 1957. He again consulted Dr. Utkov on August 31, September 7, 14 and 28, November 4, 14, 26, 30, and December 24, 1957; and again on January 22, 1958, at which time he was referred by Dr. Utkov to Dr. Justin Adler, who saw him on two occasions.

Each of the above named doctors gave their depositions in this cause and each state that the deceased gave to them physical history of suffering from epileptic seizures. None of them saw him with such a seizure but each of the doctors prescribed for him medication to control epileptic seizures, and in addition they testified that he suffered from other disabilities which they described as extreme nervousness, carbuncles or ulcers and other minor infirmities. Each and all of them state that after their examination of the insured, it was their opinion that he was afflicted with grand mal epilepsy at the time the applications were taken.

A photostatic copy of the notes taken by Dr. Don Winfield at the time he gave the insured the test referred to as the electroencephalogram on April 26, 1957, setting out his findings and history as given to him by the insured, recites the following:

"History and Seizure Description

"Discharged from the army in 1943 with DX of grand-mal. Medication and asymptomatic until 3 weeks ago. Medication stopped until seizure Monday and Tuesday. (22 & 23 April).

"EEG at KVAH in 1951."

The record at the Veterans Administration filed as Exhibit 10 to the testimony of Matthews, dated August 8, 1950, contains 13 sections. Section 8, headed "Brief medical and industrial history" shows the answer to be:

"Examined for rating purposes, VAF, Murfreesboro, Tenn. June 20, 1944. Examined, Form P-10, Kennedy Hospital, Memphis 15, Tenn. 3-31-49. Under the care of Dr. Utkov, 2142 S. Lauderdale, Memphis, Tenn. Employed as a plumber since discharge from service. Worked with father for about 4 years. Employed as plumber, O. F. Buddenbohm, Memphis, Tenn. from about the first of July until the present time, salary $45. per week."

Section 9 of said record headed "Present complaint (subjective symptoms, not diagnosis):" shows the answer to be:

"I am having these seizures more often this year than ever before."

Immediately following the above two sections, there is the following statement:

"Statement by Claimant. My answers to questions 8 and 9 have been read to me, and I hereby certify that the medical and industrial history are correct

and the complaints recorded are all that I am suffering from, to the best of my knowledge and belief.

"Signature of claimant—

/s/ James M. Jackson"

This Exhibit shows that the claimant alleged his illness to be "epilepsy", his trouble starting in 1943 while in service. It shows in detail the birthplace, date, description of the individual, his address, and that the examination was made at the Kennedy Hospital in Memphis, Tennessee.

Exhibit 9 to the testimony of the witness Matthews is a photographic copy of a letter and the envelope in which it was mailed, purported to be written by the insured to the Veterans Administration. The envelope is postmarked "Memphis, Tenn. Jan. 5, 1950." It is addressed to: "Veterans Administration, White Bridge Road, Nashville, Tenn." The contents of the letter is as follows:

"Dear Sirs;

"I am writting in regards to my pension which I was getting untill about 4 yrs. ago.

"I haven't written you before now because I kept thinking I would get better, but for the last yr. it looks like I am getting worse.

"I have been having those spells on my job in the past 8 mo. and it is dangerous and of course I loose lots of work on that account. Please let me know what to do to get my pension reinstated.

"I'm sorry I can't fine my claim no. But I guess you can fine it from my name and serial no.

"Yours

"/s/ J. M. Jackson

"James M. Jackson (printed)
"A.S.N. (20457932)"

At the request of the insured, Dr. Utkov testified that he, in the presence of the insured and insured's wife, wrote a letter to the Veterans Administration containing the following statements:

"At the request of the above patient, I am writing this letter. Mr. Jackson is a known epileptic. Since it was discovered in the service many years ago, I believe that he actually resented and refused to accept the fact he was epileptic until several years ago.

"He has lost much time from work because of his condition and has had his last seizure about nine months ago. He has been retained on Dilantin since that time and is doing considerably better. However, he still is emotionally disturbed and worried that he may have a seizure at any time.

"As I understand, he wants to receive a government pension because of this disability, and the purpose of the letter is to show reason to reopen the case.

"If anything can be done for the above patient, it will be greatly appreciated."

Dr. Minkin testified that the assured requested him to write a letter to the Veterans Administration shortly

before the assured committed suicide and, not knowing that he had committed suicide Dr. Minkin wrote a letter on May 26, 1958 to the Veterans Administration in insured's behalf. A copy of that letter is shown as Exhibit 1 to the deposition of Dr. Minkin and is as follows:

"This letter is in regard to Mr. J. M. Jackson age 35, VA file number C-3292509.

"I first saw Mr. Jackson regarding a questionable case of epilepsy on 3/19/57. He gave a history of having been taking anti-epileptic medication for seven years previously. He stated that he had not had a seizure for 1½ years. I sent Mr. Jackson to Le Bonheur Hospital for an EEG which showed abnormal waves which could be insistent with epilepsy."

Dr. Justin H. Adler testified that he specialized in Psychiatry, and insured was referred to him by Dr. Utkov. He first saw the insured on April 14, 1958, at which time he had a history from him which he made on that date, as given him by the insured, as follows:

"He states that he has been very nervous lately, very tremulous and shaky and is always afraid he might have epileptic attacks.

"He states that he has been suffering from epilepsy since he was nineteen years old and had his first attack while in the military service. For the last year he has been taking medication under the supervision of Dr. Utkov, consisting of Sodium Dilantin capsules and ULTran capsules. In addition he had been taking a sleeping capsule every night. He sleeps good at night. His appetite is very poor,

has not lost any weight lately, but last year he lost from 155 down to 120 pounds, regained some of his weight and weighs now about 140 pounds.

"He has not been working lately because the nervous condition made it impossible for him to stick to his job.

"He had an EEG done, electroencephalogram, about two years ago in Le Bonheur Hospital, and according to him, he had possible local—we put a question mark behind it—epilepsy.

"That is the history that he gave me with regard to his condition."

Dr. Adler saw insured again on May 13, 1958, and he testified that insured was not much better; that he did not follow his advice and that he so wrote Dr. Utkov. He read into the record the letter he wrote Dr. Utkov, but it seems unnecessary to show its contents.

Annie M. Jackson, widow and beneficiary under the insurance policies in question, whose testimony is in narrative form, states that she did not notice her husband with any epileptic seizures; that she did not know he had epileptic seizures; that she did not know that Dr. Minkin had treated her husband for epilepsy; that she understood Dr. Utkov was treating him for pneumonia, nervousness, etc. and that she first heard of her husband having epilepsy when she went with him to the office of Dr. Utkov on April 15, 1958, where her husband got Dr. Utkov to write a letter to the Veterans Administration requesting a pension for him; that her husband was nervous at times but was able to hold a job and do heavy manual labor; that her husband had a pneumonia attack in December of

1957, after which his physical condition deteriorated; that she did not know her husband was attended by Dr. Adler; that she knew nothing about his military career. She had been married to him 13 years.

Raymond Densford testified that the insured was working for him in his plumbing business on or about April 1, 1957; that the insured was a loyal, trusted employee and that to his knowledge he did not have epilepsy; that he never saw him with an epileptic attack while he was working for him and that insured was always able to perform the labor required of him in the plumbing work. He discharged him or let him quit work during the summer of 1957 because he did not have work for him to do.

Doris Wheeler, a niece of insured, who lived with him in his house and was in the home at the time the insured killed himself, stated that the insured's wife had gone to the drugstore when that happened; that she had never seen insured with an epileptic attack and that he was always able to perform the labor required of him in holding his job. On cross-examination she was asked if she did not tell the officer who came and investigated the insured's suicide that he had "suffered from epilepsy", and she stated that there was so much confusion and excitement that she did not remember "what she had said or done on that occasion"; that she had talked to the police officer but did not remember just what she said to him; that she did not state to him that James Jackson was suffering from epilepsy.

The testimony of Henry Booth, the agent whose name appears on the application of the insured and also on the contract of insurance in question as H. N. Booth, gave testimony as to how he and the other agent, one Herring-

ton, were together when the applications were taken and stated that Herrington prepared one of the applications and that the other one was signed by the insured in blank; that he did not hear Herrington ask insured whether he had epilepsy; that he did not hear well but was "not exactly hard of hearing"; that the application was taken while they were in an automobile with the insured sitting on the rear seat; that he knew the insured in April 1957; that he appeared to him to be in reasonably good health at the time the application was taken; that he had been to the home of insured on other occasions and he never noticed any nervousness or "epileptic fits" by insured; that he did not know that he had any illness. He was asked many questions that had no bearing whatever on the issue, some of which were objected to and objection sustained. He stated that it was not necessary to fill out the application Exhibit 6, at that time because it contained the same questions and answers as shown by Exhibit 5. The gist of his testimony is that his associate there at the time filled out one application and that later on in the office the other one that had been signed in blank was filled out, the applications being given different dates, and he finally said that he could not identify Jackson's signature; that when the applications were taken, the insured was sitting on the back seat of the automobile; that he and Herrington and Jackson were in the car because it was raining; that Jackson had never told him that he was an epileptic at any time; that he was around him many times and that he had filled out the application Exhibit 6 himself. He stated that he had taken an application from the insured before that for a mortgage policy and that Jackson did not tell him at that time that he had epilepsy. This witness admitted that he made and signed

the statement shown in longhand as Exhibit 11 to his testimony, but he explained that he said other things at the time he made the statement which the statement does not show.

The direct examination and cross-examination of this witness is so evasive that it is of but little value, if any, and on the basis that the Chancellor decided the issue it has no bearing whatever, though it is argued that the testimony of this witness who was introduced by the defendant and cross-complainant, shows a state of such carelessness and inefficiency in taking an application, as agent of the original complainant, that the complainant has waived its right to cancellation of the policy or make defense to the cross-bill on the grounds of bad health of the insured.

We are unable to follow this argument. There is nothing in the testimony of Booth that indicates that he knew insured was in bad health or had communicated any information to any official of the Company that the insured was not in good health. On the contrary, the agent Herrington, who was with Booth at the time the application was taken, stated that he asked Jackson the questions shown by the application; that Jackson gave the answers to all questions on Part A and that he specifically asked him if he had epilepsy and the other diseases listed in Q. 21 of Part A of the application and that Jackson answered ''No''; that he asked him Q. 18 of Part A relative to his health and Jackson answered ''No''; that he asked him Q. 22 relative to seeing a physician and Jackson answered that he had not; that he wrote the answers to the various questions down on the application at the time they were given to him by Jackson; that he and Booth

were together in the car at the time and saw Jackson while leaving the Densford Plumbing & Heating Company; that when the first application had been filled out completely he asked Jackson to sign both of the applications because the questions were the same and the answers shown to the questions by the application marked Exhibit 6 were filled out later by Booth; that if he had been advised of the true condition of Jackson the policies would not have been written; that the answers to questions in Part A of Exhibit 5 were filled out by the witness on April 15, 1957, at which time both were signed, and that on Exhibit 6 the name, age and sex of the insured was filled out at that time and the balance of Part A on Exhibit 6 filled out by Booth later, who copied the answers from Exhibit 5; that Booth filled out Part D on both the applications and the agent's certificate on Part A of both applications.

Harold Pennington, General Manager of original complainant, in charge of industrial insurance applied for and written by original complainant, testified that complainant did not permit nor his Department was allowed to write industrial insurance on a known epileptic or upon any person who was not in good health at the time the application was taken or upon a person who is an alcoholic at the time the application is taken, nor are they permitted to write an accident or industrial policy on an individual who is in poor health and suffering from a nervous condition. He did say that ordinary life policies were sometimes written on persons who had had epilepsy but that they are rated for higher premiums than on persons in good health, and he gave the reasons why his Company had adopted such rules and procedure as he had enumerated. He stated that if the fact that the

insured Jackson was an epileptic had been made known to the Company, the policies would not have been issued.

E. L. Rader, the District Manager of original complainant, with offices in Memphis, Tenn. testified that his office had no intimation of the untruthfulness of the answers of the insured on the application until after his death and his wife had come to the office and discussed with him the matter of her claim as beneficiary in the two industrial policies; that the agents under his supervision were not permitted to write industrial policies on persons who were not in good health or on anyone having epilepsy or suffering from nervous disorders and that to his knowledge no agent had ever knowingly procured insurance for an epileptic or persons not in good health; that if such were done the agent would be promptly discharged; that none of the discoveries which the Company had found on investigation after Jackson had committed suicide were known by complainant until after insured's death.

The definition found in our appellate court decisions of "sound health", as used in the insurance contract under consideration, was quoted to the Doctors who gave their depositions and they were asked if they accepted such as a proper definition of the phrase "sound health". They stated that they approved such definition and they were then asked if in their opinion the insured was in sound health during the period of years when they were seeing him and at the time the application was made, based upon the history given them by the insured and the diagnosis made by them. They stated that in their opinion the insured was not in sound health.

Here we have a case in which the facts as found by the Chancellor, distinguishes it from those cases wherein the

verdict or decree turned against the insured on the question of fraud, such as: Beasley v. Metropolitan Life Ins. Co., 190 Tenn. 227, 229 S. W. (2d) 146; DeFord v. National Life & Accident Ins. Co., 182 Tenn. 255, 185 S. W. (2d) 617; Life & Casualty Ins. Co. v. King, 137 Tenn. 685, 195 S. W. 585, 589; and many other cases.

We also have a case in which the facts as found and determined by the Chancellor distinguishes it from those cases where the verdict or decree turned against the insurer on account of waiver growing out of the knowledge of its agent relative to the infirm health of the insured, such as: Industrial Life & Health Ins. Co. v. Trinkle, 185 Tenn. 434, 206 S. W. (2d) 414; and many other cases.

■ In this case neither the agent Booth nor the agent Herrington knew of any physical disability of the insured at the time the applications were filled out and signed. The proof is positive and uncontradicted on that point. Neither is there any evidence that either agent learned of the physical impairment of the insured after the applications were taken, the insurance contracts issued, and prior to the suicide by the insured.

This record clearly presents a case where, if any fraud was perpetrated, it was by the insured, but the determination of fraud was pretermitted by the learned Chancellor for the reasons stated in his Opinion as herein shown, and it is likewise pretermitted by this Court.

■ Industrial life insurance policies issued without medical examination, which provide for no obligation other than the return of premiums received, unless the applicant insured thereby is in sound health on date of

issue, are enforceable. National Life & Accident Ins. Co. v. Lewis, 19 Tenn. App. 459, 462, 89 S. W. (2d) 898; Metropolitan Life Ins. Co. v. Chappell, 151 Tenn. 299, 310, 269 S. W. 21, 25; DeFord v. Nat. Life & Accident Inc. Co., 182 Tenn. 255, 258, 185 S. W. (2d) 617, 618.

In the latter case the Supreme Court said:

"This Court has approved and enforced the conditions contained in this form of industrial insurance contracts."

It then referred to Metropolitan Life Ins. Co. v. Chappell, supra, quoting with approval therefrom, the following:

" 'The application of the condition in the policy that the defendant assumed no obligation, unless the insured was in sound health at the date of the policy, is not controlled by the insured's knowledge or lack of knowledge that she was not in sound health. The existence of life and sound health in the insured, at the date of the policy, was a condition precedent to the promise of insurance' ", citing cases; and further (151 Tenn. at page 311, 269 S. W. at page 25), " 'It is the fact of sound health of the insured which determines the liability of the defendant in this character of policies, not apparent health, or his or any one's opinion or belief that he was in sound health.' "

The Court then said:

"This condition precedent is plainly expressed on the face of these policies. It is also expressly provided that 'no agent shall have the power or authority to waive, change, or alter any of the terms or conditions of this policy.'

"The defense relied on was a breach of this condition in that the insured was not in sound health at the time of making the application for the insurance and was fully aware of it. This was not disputed. He had been suffering for some time with a heart affection complicated by syphilis, for which he had been receiving clinic treatments. But, in response plaintiff relied on waiver of this condition by the agent who solicited the insurance, and invoked the rule of imputed knowledge by the Company."

It is true that in the DeFord case the condition of the insured at the time the application was taken was not disputed, but the rule can be no different where by a preponderance of the proof, it is shown that the health of the insured is not good and is unsound at the time the application was taken. Furthermore, in the DeFord case it was an admitted fact that the insured was not in good health at the trial but it was insisted that the agent knew of the material misrepresentations contained in the application and that it was his duty to disclose this to the Company and that the knowledge of the agent was imputed to the Company. The Court, in answering that contention, quoted from an Opinion by the late Judge Senter of this Court, Norvill v. Mutual Ben. Health & Accident Ass'n, 14 Tenn. App. 396, 403, in which this Court had said:

"Immediately upon its delivery to the insured, he put the policy away among his papers, knowing that it was an accident and sick benefit policy, and he evidently relied upon the statements made to him by the agent, Wood, as to the protection given him by the policy. However, it was his duty to read the

policy and to discover the application which had been copied into and made a part of the policy contract. If there were material misrepresentations contained in the application it was his duty to disclose this to the Company and to the end that the policy could be taken up if the Company issuing same so desired.''

The Supreme Court then commented, saying in the De-Ford case, 182 Tenn. at page 269, 185 S. W. (2d) at page 622, as follows:

''So that, we have here a case in which, not only was the rule not applicable which imputes the knowledge of the agent to his principal, but in which the insured was chargeable with knowledge that the authority of this agent to waive the conditions of the policy was denied by the express terms of the contract.

''In this view it becomes unnecessary to remand the case for the jury to pass on the disputed question whether or not the agent knew of the unsound health of the insured. Conceding his knowledge of it, the Company was not bound thereby for the reasons set forth above, for which reasons the judgment of the Court of Appeals must be reversed and the action dismissed.''

In National Life & Accident Ins. Co. v. Lewis, 19 Tenn. App. at page 462, 89 S. W. (2d) at page 900, supra, Judge Faw in writing the Opinion for this Court said:

''It is the fact of sound health of the insured which determines the liability of defendant under such a provision as is contained in the policy sued on, 'not apparent health, or his or any one else's

opinion or belief that he was in sound health.' If the assured was in fact not in sound health, as that term is construed, either at the time the application was signed or at the time the policy was issued and delivered, there could be no recovery under the provisions of the policy sued on. Commonwealth Life Insurance Co. v. Anglin, supra, 16 Tenn. App. 530, at page 537, 65 S. W. (2d) 239, 243.''

In that case he also defined the term ''sound health'', which definition is in substance the same shown by the record in this case as being given by the doctors who testified.

In Bailey v. Life & Casualty Ins. Co. of Tennessee, 35 Tenn. App. 574, 250 S. W. (2d) 99, 103, this Court in an opinion by Judge Hickerson of the Middle Section, reiterated the rule:

''There can be no waiver of the provisions of a written contract unless the party making the waiver has full and complete knowledge of the facts. Somerville v. Gullett Gin Company, 137 Tenn. 509, 194 S. W. 576; Arnold v. Locomotive Engineers Mut. Life & Accident Insurance Association, 30 Tenn. App. 166, 204 S. W. (2d) 191; Umstattd v. Metropolitan Life Insurance Company, 21 Tenn. App. 312, 110 S. W. (2d) 342.

''Waiver is the relinquishment of a known right. Baird v. Fidelity-Phenix Fire Insurance Company, 178 Tenn. 653, 162 S. W. (2d) 384, 140 A. L. R. 1226.''

It is true in that case the facts were not identical to the facts involved in the instant case, but there is no difference in the applicable rule.

In Industrial Life & Health Ins. Co. v. Trinkle, supra [185 Tenn. 434, 206 S. W. (2d) 415], Chief Justice Neil, commenting on the holding in the DeFord case, supra, said:

"While it is sound in principle, for reasons stated in the opinion and upon the authorities cited, it should not be considered as stating an inflexible rule by which all future decisions of this Court are to be controlled. Whether or not the plea of waiver in a given case is good, as under the authorities cited, or is not available as held in the DeFord Case, must necessarily depend upon the facts and circumstances of each case under consideration."

■ Conceding that the facts are not the same in the cases relied upon by counsel for defendant, appellant in this Court, nor those relied upon by counsel for original complainant, appellee in this Court, as relates to the real issue determined by the Chancellor, we think that all of the cases very clearly point out that there must be some knowledge on the part of the agents of an insurance company of the untruthfulness of material statements made by applicants for industrial insurance without medical examination, before waiver of a legal provision in a policy can be made effective against the company.

■ The facts in the instant case reveal, without contradiction, that the insured was afflicted with epilepsy grand-mal, as described by the medical authorities testifying in the case; that he knew what his condition was whether he admitted it or not; that he had other complications of extreme nervousness along with that condition, which taken together or separately, tended to create a condition which would shorten his life below that of a

normally healthy person by both disease and accident, and that the Chancellor was eminently correct in the determination of that issue as set forth in his Opinion and Decree.

All Assignments of Error are therefore overruled, the Decree of the Chancellor affirmed, and the costs of the case in this Court are adjudged against the original defendant and cross-complainant, appellant here, Annie M. Jackson.

Carney and Bejach, JJ., concur.